**UNITED STATES of America, Plaintiff,**

v.

**Richard W. McLEAN, Defendant.**

**No. B–CR–80–67.**

United States District Court,
W. D. North Carolina,
Bryson City Division.

Dec. 1, 1981.

**10**

Max O. Cogburn, Jr., Asst. U. S. Atty., Asheville, N.C., for plaintiff.

Russell L. McLean, III, Waynesville, N.C., for defendant.

## MEMORANDUM AND ORDER

WOODROW WILSON JONES, Chief Judge.

The Defendant, Richard W. McLean, while represented by counsel, entered a plea of guilty before J. Paul Teal, Chief Magistrate on December 12, 1980 to a charge of "the possession of a loaded, unpacked, and uncased weapon on or about December 6, 1980, within the Great Smoky Mountains National Park, a Federal Reservation, in violation of 36 C.F.R. 2.11(a)." He was also charged with two other offenses involving hunting in the Park but these charges were dismissed as the result of a plea bargain when his plea of guilty to the gun charge was accepted by the Court. The Magistrate entered a probationary type sentence and ordered the Defendant to pay a fine. The Defendant has paid the fine.

Prior to his plea the Defendant moved to dismiss the charges on the grounds that the Court lacked jurisdiction of the offenses. The motion was denied and the Defendant appeals to this Court.

The motion to dismiss was renewed in this Court and was heard in Bryson City at the September term 1981 and the Court now enters its findings and conclusions.

The Defendant contends that the United States of America lacks jurisdiction over the property on which the alleged violation took place and that therefore this Court would not have jurisdiction of the offense. This contention is based upon the allegation that the 44,400 acre tract known as the "Fontana Addition" was included in the boundary of the Great Smoky Mountains National Park in violation of the Enabling Act, 16 U.S.C.A. 403 and therefore the Park officials have no jurisdiction over any occurrence on said tract. It is not disputed that the alleged offense occurred on the 44,400 acre tract known as the "Fontana Addition" so the only question raised by the Defendant's motion is whether the tract in question is a part of the National Park.

On May 22, 1926 the Congress of the United States enacted a statute designated as 16 U.S.C.A. Section 403 which reads in pertinent part as follows:

When title to lands within the areas referred to in this section shall have been vested in the United States in fee simple there are established, dedicated, and set apart as public parks for the benefit and enjoyment of the people, the tract ... of land in the Great Smoky Mountains in the States of North Carolina and Tennessee being approximately seven hundred and four thousand acres, recommended by the Secretary of the Interior in his report of April 14, 1926, which area, or any part or parts thereof as may be accepted on behalf of the United States in accordance with the provisions hereof, shall be known as the Great Smoky Mountains National Park. Provided, that the United States shall not purchase by appropriation of public moneys any land within the aforesaid areas, but that such lands shall be secured by the United States only by public or private donation.

Shortly after the passage of this Act the State of North Carolina set up a corporation known as the North Carolina Park Commission, Public Laws 1927, Ch. 48, so that the State could avail itself of the provisions of the federal act. The corporation was an agency of the State and was given

the power to issue bonds and to otherwise raise funds with which to acquire lands, by purchase and by condemnation for the purpose of deeding said lands to the United States in fee simple for the establishment of the Great Smoky Mountains National Park. See *Yarborough v. Park Commission,* 196 N.C. 284, 145 S.E. 563 (1928). The North Carolina Park Commission through the issuance of bonds and by a contribution by the Rockefeller Foundation acquired title to all other land except the 44,400 acre tract in question and deeded it to the United States for the Park.

After the Park was established the Congress created the Tennessee Valley Authority for the purpose of maintaining and operating the Muscle Shoals properties, improving navigation on the Tennessee River and for controlling floods in the basins of the Tennessee and Mississippi Rivers. 16 U.S.C.A. Section 831. Under the power granted to it by Congress the T.V.A. constructed a large dam and reservoir on the Little Tennessee River in Western North Carolina known as the Fontana Dam and Reservoir. Between the reservoir and the Great Smoky Mountains National Park lie the forty-four thousand four hundred acres of mountain lands in question in this lawsuit. When Congress authorized the building of Fontana Dam and Reservoir in 1942, H.Res. 1470, 77th Congress, 1st Sess., two hundred and sixteen families occupied this land and their only public means of ingress and egress was North Carolina Highway No. 288 which was flooded by the reservoir. This situation posed a problem for the United States, the State of North Carolina and Swain County. The interest of the United States was that of the T.V.A. and the National Park Service. The T.V.A. interest was first, the 44,400 acres of land formed a part of the watershed of its reservoir and if left in private hands could cause trouble in the future; and second it had a statutory duty to help alleviate the hardships brought about by the construction of the dam and reservoir. The interest of the United States was also heightened by the fact that the 44,400 acre tract had been included in the Great Smoky Mountains National Park

project although not a part of the Park at this time. North Carolina was interested because of its obligation to furnish a public highway system for its citizens which included the 216 families affected by the building of the reservoir, and Swain County had issued bonds to finance the construction of the road originally and part of these bonds were still outstanding.

The parties agreed to a solution of the problem. The settlement agreement between the State of North Carolina, Swain County, the National Park Service and the T.V.A. provided that the State would contribute $100,000.00 to the T.V.A. which would be used to acquire the land in the area, so as to relieve the State of the duty to provide a road for the section and Swain County was to be paid $400,000.00 by the T.V.A. to help retire the outstanding road bonds and the T.V.A. was to transfer all the area to the National Park Service for inclusion within the Great Smoky Mountains National Park. The agreement was approved by the Governor, the Council of State and the General Assembly of North Carolina, and was carried out by all parties.

These facts are taken from the findings of fact in two lawsuits involving this boundary of land. See *Yarborough v. Park Commission, supra; United States v. Welch,* 150 F.2d 613, (4th Cir. 1945) and *United States v. Welch,* 327 U.S. 546, 66 S.Ct. 715, 90 L.Ed. 843 (1946).

The Defendant contends that the 44,400 acre tract of land was acquired by the Park Service in violation of the Enabling Act, 16 U.S.C.A. Section 403 in that the T.V.A. used funds appropriated by the Congress. The Defendant offers no proof that appropriated funds were used to buy the land but it appears to be conceded by the Government that such funds were in fact used in carrying out the agreement entered into by the T.V.A., the State of North Carolina, Swain County and the Park Service. The record shows that $100,000.00 of the money came from the State of North Carolina and the use of this money would be in keeping with the Enabling Act. The payment of the sum of $400,000.00 to Swain County was in set-

tlement of its claim for the loss of the road caused by the construction of the dam and reservoir. In fact, a strong case can be made for the argument that the entire transaction was conducted by the T.V.A. in settlement of its obligations and liabilities arising out of the building of the dam and reservoir authorized by the Congress. The Government filed with the Court a copy of a letter dated August 17, 1943 from the General Counsel of the T.V.A. to the Solicitor General's office of the Department of Justice in which he sets forth that the maximum liability of the Authority "with respect to Highway 288 is represented by the cost of replacing it on an equivalent basis, the cost of such a replacement being estimated at approximately $1,200,000. As pointed out to you, however, the existing road has not been constructed to a particularly high standard, and its relocation on an equivalent basis would admittedly constitute an unwise and inefficient use of public funds. Further, the War Production Board has indicated that it would be unwilling to issue the approvals necessary for the reconstruction of this highway. The problem accordingly became one of disposing of the liabilities of the Authority with respect to the road without actually rebuilding it, and without incurring a greater cost than the estimated cost of the road relocation, all in a manner which would be consistent not only with the interests of the Federal Government but with those of the State of North Carolina and Swain County as well. The proposed 4-party agreement, which effectively disposes of the Authority's liabilities at an estimated cost of $1,075,000 is our considered answer to this problem."

It therefore appears that if this approach of the T.V.A. to the problem is factually and legally sound then the Defendant's motion must fail for there would have been no violation of the Park Enabling Act. The four party agreement was entered into and carried out and the Authority's obligations and liabilities for the taking of the road were satisfied. The lands were acquired by the T.V.A. and then conveyed to the Interior Department for inclusion in the Great Smoky Mountains National Park, but re-

serving to the T.V.A. all rights required to carry out the T.V.A. program.

Litigation arose over the authority of the T.V.A. to acquire the lands in question with particular reference to its authority to condemn six tracts of the lands which the owners refused to sell. The case of *United States v. Welch, supra,* reached the Supreme Court and Justice Black writing for the Court reviewed the entire matter including the four-party agreement including the transfer of the lands by the T.V.A. to the Park Service. The Court concluded that Congress had authorized the T.V.A. to condemn lands under the circumstances shown by the facts and further observed:

After a year and a half of negotiations a solution was worked out. After the proposed solution was approved by the Governor, the Council of State, and the Legislature of North Carolina, it was embodied in a settlement agreement between the State, the County, the National Park Service, and the T.V.A. Under that agreement the T.V.A. with the aid of a $100,000 contribution by the State was to acquire all the land in the isolated area, either by purchase or condemnation, so as to relieve the State from further responsibility for maintaining a highway to that section; Swain County was to be paid $400,000 by the Authority to help retire its outstanding road bonds; and the Authority was to transfer all the area lands to the National Park Service for inclusion within the Great Smoky Mountains National Park but reserving to the T.V.A. all rights required to carry out the T.V.A. program. The agreement, thus, satisfied the interests of the state, the county, the T.V.A., and the National Park Service. The cost to the United States was several hundred thousand dollars less than the cost of rebuilding the old road. And all the landowners in the area, except these six respondents who refused to sell, have received full compensation for their property.

The Court further said:

In passing upon the authority of the T.V.A. we would do violence to fact were

we to break one inseparable transaction into separate units. We view the entire transaction as a single integrated effort on the part of T.V.A. to carry on its Congressionally authorized functions. Cf. *United States v. Commodore Park,* 324 U.S. 386, 392, 65 S.Ct. 803, 806 [89 L.Ed. 1017]. And we find not only that Congress authorized the Authority's action, but also that the T.V.A. has proceeded in complete accord with the Congressional policy embodied in the Act. That Act does far more than authorize the T.V.A. to build isolated dams. The broad responsibilities placed on the Authority relate to navigability, flood control, reforestation, marginal lands, and agricultural and industrial development of the whole Tennessee Valley. The T.V.A. was empowered to make contracts, purchase and sell property deemed necessary or convenient in the transaction of its business, and to build dams, reservoirs, transmission lines, power houses, and other structures. It was particularly admonished to cooperate with other governmental agencies—federal, state, and local—specifically in relation to the problem of "readjustment of the population displaced by the construction of dams, the acquisition of reservoir areas, the protection of watersheds, the acquisitions of rights-of-way, and other necessary acquisitions of land, in order to effectuate the purposes of the Act." All of the Authority's actions in these respects were to be directed towards "development of the natural resources of the Tennessee River drainage basin and of such adjoining territory as may be related to or materially affected, by the development consequent to this Act * * * all for the general purpose of fostering an orderly and proper physical, economic, and social development of said areas." To discharge its responsibilities the T.V.A. was granted "such powers as may be necessary or appropriate" for their exercise.

And the Court said further:

 . . . Neither the fact that the authority wanted to prevent a waste of government funds, nor that it intended to cooperate with the National Park Commission detracted from its power to condemn granted by the Act. The cost of public projects is a relevant element in all of them, and the government, just as anyone else, is not required to proceed oblivious to elements of cost. Cf. *Old Dominion Land Co. v. United States,* [269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162], *supra.* And when serious problems are created by its public projects, the Government is not barred from making a common sense adjustment in the interest of all the public. *Brown v. United States,* 263 U.S. 78, 44 S.Ct. 92, 68 L.Ed. 171.

The lands were legally acquired by the T.V.A. under its authority to condemn and under its authority to effectively dispose of its obligations and liabilities through agreement. The Supreme Court approved the acquisition and knew of and discussed the transfer of the lands to the Interior Department for inclusion in the Park. It is true that the question of whether such transfer violated the Park Enabling Act never arose in the *Welch* case. An examination of the law and the facts leads to the conclusion that such transfer was not contrary to the Enabling Act.

The lands included in the "Fontana Addition" were transferred by the T.V.A. to the National Park Service for inclusion in the Great Smoky Mountains National Park by agreement of transfer dated March 31, 1948. This was done in accordance with Sections 4(k)(a) and 4(k)(c) of the T.V.A. Act of 1933, as amended, 16 U.S.C.A. Section 831c(k)(a), (c). Section 4(k)(a) empowers the T.V.A. in the name of the United States, "To convey by deed, lease or otherwise, any real property in the possession or under the control of the corporation to any person or persons for the purpose of recreation . . ." There can be no doubt that the Park in question here would constitute a recreational purpose as used in the statute. The actual transfer by the T.V.A. was a public donation and a public donation is mentioned and permitted by the Park Enabling Act. In the *Welch* case the Supreme Court recognized that the land being ac-

quired by the T.V.A. was to be included in the Park. The Court said: "The United States' interest in the land through the National Park Service was due to the fact that this particular area had been included in the Great Smoky Mountains Park project."

The Court concludes that there were no appropriations of public money used to acquire the lands in question in violation of 16 U.S.C.A. Section 403. That any public funds which may have been used in the consummation of the four-party agreement were legally used by the T.V.A. under its authority granted by the Congress and that its later transfer of the lands in question to the National Park Service was a public transfer permitted by 16 U.S.C.A. Section 403. It follows that the National Park Service has jurisdiction over the 44,400 acre tract known as the "Fontana Addition" and this Court has jurisdiction of the offense preferred against the Defendant. His motion to dismiss will be denied.

IT IS THEREFORE ORDERED that the Defendant's motion to dismiss the charges to which he entered his plea of guilty be and the same is hereby denied.

This the 1st day of December, 1981.